Nailer. I'm the attorney on behalf of the appellant Louisiana Division Sons of Confrederate Veterans. It's a historical organization that is there to preserve the name of the Confederate soldier. It actually began in New Orleans in 1896 when around the time General Stephen Dill Lee, so it's ironic that I'm arguing here today. Now what we're here today is that in the Are you saying the Louisiana Division is the largest of all of these Confederate veterans or are you just talking about the Confederate veteran group overall? No, Your Honor. Just for the state of Louisiana. Overall, the Sons of Confederate Veterans, the national organization is. I was wondering what you meant by that. Oh, I'm sorry, Your Honor. A division is divided by per state. So there's 50 divisions, believe it or not. Thank you, Your Honor. Now what happened was in around the summer of 2015, my client was contacted via email by the HDBA, one of the defendants, which invited them to apply to participate in a parade. Now my client has participated in Natchitoches Festival of Lights Christmas Parade. Yes. I wonder if that's where your brief at some point seems to be saying and maybe it literally says that your approval was withdrawn or canceled or whatever. Address that. Are you saying you did get approval in some way or are you just talking about this invitation, this notice probably sent to a lot of previous participants saying do you want to apply again? Well, Your Honor, the way my client describes it is the way people are allowed to, they're invited to actually participate in a parade. Is that what you're saying got canceled or did you actually get some sort of agreement that you would participate that then was withdrawn? Your Honor, what I'm trying to say is they did get an application, which they filled out, and in order for them to march, they had to agree to not carry the Confederate battle flag. So according to my client, they believed that was, that they were allowed to march and then it was withdrawn because they refused to carry the battle flag. That's my client's position. Oh, they filled out the application? Yes, they did fill out the application. Did they ever get a thing, you are welcome, but here are some guidelines that say do not carry this other stuff? I mean, did they get a welcome to the event, a letter that said you are approved? Well, they got a, basically to answer your question, they didn't get an email that stated yes, you are approved, but I'm going to get back to that later. But to answer your other question, they did get some documents, which is a standard of excellence, which states you have to sign or agree to standard of excellence in order to participate. And in that standard of excellence, it's reviewed by the, it was turned out to be reviewed by the city attorney. However, he can describe his participation with that. I'm not going to speak for him. Now, what had happened was after that, your honor, there was a letter sent by someone known as the voters league, I'm just going to call them the voters league, that requested to the mayor's office that they be deleted from participating in the parade. So that's when the mayor sent a letter to the organization, HDBA, requesting that they not be allowed to carry the Confederate battle flag. And then there was a meeting organized, the mayor had organized some meetings at that point. And then when my client pressed the HDBA further, they sent them an email stating that, because my client wouldn't agree not to march out the Confederate battle flag, they were sent an email that said something to the effect to refer to the mayor's letter. Let me ask you about the series of, did you have a follow up, Jennifer? No, I was going to switch to the prescription period. Okay. Yes. There's a letter from the mayor to the historic district, November 2, saying what you just said. Yes, sir. They should not be allowed to, we respectfully request the committee not allow the Confederate flag. There's a letter on November 3 to the mayor, we have a receipt and we will comply. Then there's a letter on November 4 to your client saying we appreciate your interest in the parade. Your application was not approved. Did you take that, should that be taken as a rejection of the right to, I guess right, willingness of the organizers to allow your group to parade? Had there been some sort of conversation that the record would support? I mean, we went from, it's all right to let them, we ask that you just not let them march with the flag, to what seems to me on his face to be a letter saying you can't parade at all. Is there any further part of the story there or am I misreading the letter from the organizers to your client? No, your honor, you're not misreading the letter, but there is a little more facts in between. What had happened was when in the meetings with the mayor and they had, I forget who else was involved, there was also I believe Ms. Bonet was CC'd on it, she's one of the defendants. But when they refused to not march in a parade with the Confederate battle flags, and at that moment, after that, that's when that email was sent to the mayor where the HCBA said we will comply. So my client's contention was that they were already, they were going to be allowed to participate, but then it was withdrawn later when they refused not to march with the Confederate battle flag. They had participated in this parade for approximately 25 years previously. They carried all the historical flags. It's not that they believe that these are symbols of hate or anything like that, your honor. What it has to do is it's historical accuracy. Most of these men are Civil War reenactors, so they carry replicas of the weapons. They march in formation. They have a little trailer in the back that some of the older members ride on, and sometimes they'll have a cannon with them. So, and also I believe that Judge Elrod was going to ask about the prescription period. Okay, your honor, that's, what had happened was when I had initially filed this suit, we were unaware that the HCBA was a quasi-public entity. We had believed it to be a private entity, which for purposes of 42 U.S.C. 1983, they're not a proper defendant. However, in the initial lawsuit, when I filed it in August of 2016, we did include John Doe defendants. Later when we had a scheduling conference, there was a deadline to add all the defendants, which I believe the deadline, and I could be corrected by opposing counsel, I believe it was around, somewhere in January of 2017. Anyway, once we started getting into depositions, in May of 2017, when we deposed the first defendant, Miss Bonette, she started talking about her participation in the meetings. That's when we became aware that the HCBA was more than just a private entity, that we saw evidence that it was a quasi-public entity. Whereupon, five days after that deposition, I amended the complaint. I submitted a memorandum in support, acknowledging that we had missed the deadline already for all the defendants. Citing that, we were unaware, we didn't have evidence of this until much later. Whereupon, a Rule 15 relate back was granted by the magistrate judge. Then, after the defendants filed their motion for summary judgment, what had happened was, at that moment, the district judge cited prescription, even though there was a previous ruling in favor with the Rule 15 relating back. I hope that answered your question, Your Honor. Your position is that because you were specifically given permission to add this, it relates back to the time of the filing of the suit, and therefore, it's not prescribed? Yes, Your Honor. Also, we had John Doe defendants previously. There was a placeholder defendant for that, and then once the identity became known at the earliest possible, then it relates back to the time? Correct, Your Honor. Okay. And I was going to point out, because the opposing counsel is going to bring it up. But you told the district court all of this, right? Yes, Your Honor. That's in the record. At least whenever John Doe, you just were misunderstanding their role, but you knew about them from the start. Yes, Your Honor, they were, but we knew about their existence. We did not know of their role, their correct role. We did not know of John Doe. John Doe is where somebody hits you with a car and you don't know who it was, but they were driving a McDonald's truck, so you assume McDonald's, but you don't know who the individual driver was. Here, you knew who these people were. You just didn't know, and they would contest as quasi-public, but you didn't know they were quasi-public. That was what you didn't know. You knew about them. Well, Your Honor, I'm going to stand corrected. You're absolutely correct in that, that the John Doe defendants were for people that we did not know of their existence at the time, and the reason why I referred to the Honorable Judge Elrott earlier was it's because I'm just stating the fact that the John Doe defendants were placeholders, and I'm alluding that we were unknown to their identity, but their participation in this case is the actual reverse. We knew their identity, but we were unaware of their participation. That's why I referred to it that the John Doe's were the placeholders at that moment. I understand that there's not really cases that show that, but so this would be a first impression argument that I'm making. Pardon? I'm sorry. Go ahead. Pardon? Go ahead and finish answering Judge Elrott. Yes, Your Honor. Does my answer suffice? Well, I don't see how that helps you with limitations or prescriptions. Well— You know that somebody, and they're not a John Doe, even assuming arguendo, which I'm not sure is correct, that the John Doe placeholder would preserve limitations. I think your argument on relating back number 15 is really the only argument you have. Yes, Your Honor, and the magistrate—actually, Your Honor, actually, what you just stated actually mirrored what the magistrate had stated. He believed that—he stated specifically we already knew their identity and that the relation back—he ruled in favor of the relation back. Okay. Thank you. Thank you, Your Honor. It's a very good question. Yes? So what relief do you seek from us today? The relief that we're seeking, Your Honor, is actually to deny their motion for summary judgment and remand this so we can proceed because there's many undisputed—we have— there's many disputed facts, such as whether or not they're going to contend whether or not the HDBA was actually a public entity, quasi-public entity or not. We argue, and it is, and we stated the reasons why. The other is that whether or not that when they sent that email to— whether or not that didn't apply, whether or not that was an acceptance, whether the mayor's participation caused a rejection of the participation of my client. But ultimately, Your Honor, my client, not just for the nominal damages, they want to be able to participate in a parade. That's their—and carry their historical battle flags. They only want to participate if they can carry their historical, right? Yes, Your Honor. And, yes. Okay. So you believe that there is a fact issue in the district court should have granted as to each of the defendants? Yes, Your Honor, I do. And the reason being is that—and I'm not—I'm going to speak about the mayor, the defendant, Bonet, the city, and the police chief himself. We consider them the final policymakers because they were all participants either in meetings or in meetings with my client or meetings with the HDBA. The reason why, as far as the HDBA being held liable under 42 U.S.C. 1983 is because it is an organization that receives public monies, and we're arguing that the parade in this instance, although many parades are private—private parades— in this instance, because there is evidence of a cooperative endeavor agreement, which, according to the Louisiana Constitution, Article 7, Section 14c— I'm sorry, Article 7, Section 14c states that governments, government agencies can contract with private parties for public purposes. And that's why we're holding them— that's why specifically we're stating that they're liable. But mainly, I think, Your Honor, that where it's going to turn is not only just the actual character of the HDBA, but whether or not that my client—were they accepted at this parade and then they were denied, rejected because of the influence of the mayor, or did they just send the applications out? The other thing, and I didn't have very much time to talk about, was that the standard of excellence itself, Your Honor, we're also alleging is against public policy because based on the deposition testimony of the defendants, the mayor, the police chief, Ms. Burnett, and they actually bar other groups such as gay and lesbian groups. There is also banning of quantum music. My time's up, and I don't have very much else to say. Okay, Your Honor. But we believe that that standard of excellence is also— Thank you. Thank you, Your Honor. Thank you. Thank you. Thank you. Good afternoon, Your Honors. May it please the Court. My name is Jack Truitt, and I represent the Historic Business District Association. I want to start with a statement that opposing counsel just made, which I think is really interesting. He said that he considered the mayor and the police chief to be the ultimate policy makers. My client, the Historic Business District Association, is not a governmental entity. They receive no funding from the city. There was no financial oversight from the city. They're operating pursuant to a cooperative endeavor agreement. They're a 501c6 nonprofit. There's no appointment of members by the city. So this is a historical business district in Natchitoches, Louisiana, that has members from this historic district right on the river, and the city does not participate in any way, shape, or form in what the historic business district does. Counsel, what would you say your best case is in support of what you just told us? What would I say my best case is? I think that— It's your Fifth Circuit case that is really like this. You get a permit from the government of the municipality to authorize the activity. There's some relationship between the two. There's some money involved, but you would say all sort of at the margins. Where has this court or some other court addressed this sort of relationship and said that's not state actor? They're not a state actor, and there are other cases, Your Honor. What? I mean, what case would you point out to us in particular that we should rely on? The United Auto Workers case, I think, is very instructive because the facts were very analogous in that case. In that case, you had the United Auto Workers who wanted to pass out— That being the Fourth Circuit case. Yes, sir. So it's not a Fifth Circuit case that you would say is directly on—as good. Judge Ludek went through it in a way that I'm sure you embrace completely. Yes, sir. But have we ever dealt with this issue? I could not find another case that was factually analogous, Your Honor. There are other cases, though. There's Wong. There's Viljagas. That's good. You've told me that the Fourth Circuit case is your more or less most on-point case, and that's all I'm asking. Yes, sir. Yes, sir. And so I think if we start by labeling historic business district associations like this or fair sponsors as governmental entities, I think that we're going to open Pandora's box and we're going to have entities being deemed to be governmental entities, and where would the line stop? I mean, it would be very problematic for us to go in that direction. In this particular case, there was no requisite nexus between the city and the historic business district. The conduct there is not fairly attributable to the city. While the city may from time to time put on their own events, in this case the historic business district association put on its own event separate and apart. And while it's true that the city provided, for example, police protection or may have paid for maintenance workers after the parade, I don't know that that necessarily equates to what the historic business district association was doing in this case, was a governmental act or deems them to be a state actor. So you didn't have to pay for that privilege of the maintenance people to help pick up the stuff? The city picks up that tab. So they're cooperating with you. You said it would be a terrible thing if we were to hold that you were government actors. Yes, ma'am. That would be a terrible thing. But would it also be a terrible thing if the government wanted to discriminate against particular groups and so it would work through a third party that they would express their viewpoints to, but then they could say, well, the third party is responsible and the third party doesn't have to follow the First Amendment. So they're accomplishing their goal through the use of a vehicle of a third party. Wouldn't that be just as concerning? Right. So you're saying, in other words, that it would be like a ruse that we're going to discriminate through a private entity. And while that may be problematic and that could potentially be an issue in a case, those are not the facts in this case. And we have to determine this case based upon the record that was adduced in this case and what the trial judge had before him in deciding the summary judgment. Didn't the mayor decide not to specifically told your entity that it would be a bad idea to let them participate in this? He did. He did say that. And in context of the South Carolina church shooting, I submit that it would have been a bad idea. But isn't that a heckler's veto? Because they said that they were concerned the Black Panthers were coming or something on the record here. And so it allows, because other people may come that disagree with the speaker, and they may cause problems. And I'm not saying they would cause problems. Please, I'm just saying I'm looking at the record and what was alleged by the plaintiff and what was said by the mayor. Why isn't that a heckler's veto? No one is saying that this group here is causing problems or causing a riot or anything. It's that other people's reaction to them would cause a problem. Right. Isn't that correct? And I understand that. One thing I do want to jump back to, though, and it doesn't address your question, Your Honor, but Judge Southwick, you asked a question about this invitation and whether or not it was withdrawn. That is just completely inaccurate. What happened in the case was there was this agreement sent, and they never signed it and returned it. Why was it sent? Because they had paraded before? Because they had paraded before, and it was just sent out as a matter of . . . You sent out, maybe call it the list somewhat, but basically those who participated before get these sorts of documents. Very perfunctory, yes, sir. Okay. But to get back to your question, Judge O'Rourke . . . Well, but if you're saying there's something wrong about what your friend on the other side was saying, what was really wrong about that? I mean, he did say we got these documents, we filled them out, we sent them back. Isn't that all? That's not what happened? That's not correct. They were never signed and dated and sent back, number one. And number two . . . He didn't say that. I thought he did. Anyway . . . There was this discussion about, well, maybe you could parade if you don't parade with the Confederate battle flag, which was the source of controversy, and they chose. They elected not to parade, so that was their own choice, not to participate in the parade. Right, but it was a government react. Government was doing this. It wouldn't matter whether they chose not to go without their flag or not because it would still be a First Amendment problem. Right. And I'll let my esteemed colleague address that. Do you have anything to say about the heckler's veto that your organization decided on? Here's what I think is important, Your Honor, is even if we assume that somehow we are a state actor and that we're making a decision that violates someone's First Amendment rights, then I think what you have to go to is the strict scrutiny of whether or not there's a legitimate purpose expressed for not allowing them to participate. What is the legitimate purpose? Because you're not paying for the security or the cleanup. They're already spotting you that. So what's the legitimate purpose that you would have? The concern that the parade was going to be disrupted because of security issues involving these protests and the reaction. The reaction? That's a quintessential heckler's veto. Every single one of those reasons are because other people might do something disruptive, isn't it? Aren't those? That is not ever a legitimate reason to shut down something, the heckler's veto, is it? I disagree. I think that even a governmental entity has a right to determine whether or not someone can participate in something if it's going to be disruptive. What about if some white supremacists said they were going to protest if any people of the African-American race were in the parade? Would that justify you all excluding African-Americans from the parade? You're asking me as the attorney for the HBDA? Yeah. I think if there were legitimate safety concerns, then yes, I think that would be appropriate in this case. Are people based upon their race from participating in your parade? No. We had a security expert that we introduced as an expert in this case, and that was not refuted. That was not refuted on the summary judgment. He testified under oath that there were going to be safety issues involved if the Sons of the Confederacy veterans were allowed to participate and wave their Confederate flag around. Those justifications have not been accepted. This is a very frequently litigated issue. In colleges, for example, you don't get to shut down the college speaker in a public institution because other people might come and disrupt that college speaker. That's the way the law works. Right. What you're speaking of, Judge Elrod, would be the college or the university as a state entity. Is that correct? Right. That's why you said if you were a governmental entity, you said you still could bar people based upon the security impact, and I'm testing that premise. That's correct. I would submit to the court that we do have a right to regulate the participation of people if we're deemed to be a state actor based upon safety concerns. What case says that? I don't have that case, Your Honor. Okay. So maybe your best bet is that you're not a state actor and he's going to have this argument and not you. I would agree with that. And then the prescription argument, which I didn't address, and I was impressed that you, Your Honor, brought up, used the prescription term as opposed to statute of limitations. Excuse me. You're here to say you're not a state actor, and you were taken in directions that perhaps don't quite fit your argument. I think the city may be able to respond to some of what we have. Yes, sir. Thank you, Your Honors, for your time. Do you mind addressing the 15 argument real quick? That was never raised on summary judgment. And I think you asked a question, Judge Elrod, as to whether or not that issue was ever brought up on summary judgment in opposition because you said, well, the judge had this all before. Right. If the magistrate judge already allowed the relation back, then you wouldn't send summary judgment out the claim if they were allowing it. The judge decided, as Judge Haynes mentioned, that they knew about the HPDA. And so they're reversing the magistrate judge on this problem. Correct. Correct. And I think it's important because the issue is John Doe doesn't get it. That doesn't get it under the law of prescription. And the other issue is under the law of prescription, it's what information does the plaintiff have that would incite sufficient inquiry to determine whether or not, in this case, the HPDA was or wasn't a governmental entity. Okay. Thank you very much. Thank you, Your Honors. I appreciate your time. Good evening, Your Honors. I'm Ronald Corcoran. Good evening, you said. Good afternoon. I represent the city of Natchitoches, Mayor Posey, Chief Dove, and Samantha Barnett. I'm sorry. I didn't say Natchitoches correctly. I said it like our sister place in Texas. Natchitoches? Yes. And so it's Natchitoches, excuse me. Natchitoches. Can you please answer Judge Haynes' hypothetical with the HBDA? Well, I just said if a white supremacist group threatened to come and raise a lot of trouble and harm the security of the parade if African-Americans were allowed to walk in the parade, would that justify the city excluding African-Americans from this parade? If it was the city's parade, I think it would depend on the circumstances. There would have to be a legitimate and there would have to be certain restrictions. If it is a parade held by a private entity, such as the HBDA, then I think they can govern their parade. Counsel, can you, okay, I don't really understand. This hypothetical says it's the city's parade. Okay. Take that. Are you saying it can ever bar people based upon their race? Oh, no, not based upon their race, no. Oh, because the other people are going to come after them and they can't afford the security. No, not based upon their race. So they cannot. What was different about her question than mine? I misunderstood, I'm sorry. You misunderstood a question about white supremacists trying to bar African-Americans. I didn't connect it. I didn't put it all together. Okay, all right. So why is that not acceptable? I'm glad we agree that that's not acceptable, but why is that not acceptable, but it's okay to borrow other peaceful marchers based upon the heckler's veto that other people, that a different group is going to come in and disrupt? Why is it, why are you not treating them the same? That's not what happened here. I mean, this was a private parade put on by the HDBA. If this were a public parade, would your city have been able to bar his clients from marching with their flags if this were a public parade? Then we get to the question that I answered a while ago, and that would depend on the circumstances. What circumstances? We never barred the Sons of Confederate Veterans from marching in the parade. In fact, this is kind of a long answer to your question, but it also answers a question Judge Southwick asked earlier of plaintiff's counsel, and there was background. You asked about the letter of November 2 from the mayor that requested that they not allow the flag in the parade, and the letter from HDBA to the Sons of Confederate Veterans said your application to march in the parade is denied. In other words, you can't march in the parade. And I think you asked is there some background there. There was a meeting in my office where the mayor is trying, and all the people present are trying to figure out is there some compromise, and I asked Mr. Paul Grambling, you know, how about marching in uniform with all your flags but that battle flag that has been hijacked by so many hate groups? And it has. Every time you see something bad on TV, some white supremacist group or skinhead group or what have you, it might be wrong, but they're waving that Confederate battle flag. It's been hijacked. And so how about leaving the flag out? And Mr. Grambling's response was we'll never compromise. To compromise is to surrender. We will never surrender. You're saying that meeting happened between the mayor's letter? No, that meeting happened before. And so when the mayor's letter requesting that they bar the flag from the parade, it was already known that they weren't marching without the battle flag. Counsel, it seems to me, though, that based upon what you've explained to us here, the mayor had his lawyer conduct the meeting about whether the people would be able to participate in the parade with their flag, and you said the mayor's trying to work it out and figure out a solution. It doesn't sound like the mayor, that it's not the mayor's parade or the city's parade if the mayor is the one. They knew that the mayor is representing the city of Niagara. So the city's very involved in this parade. It's involved in the city, and the parade is in the city. And 60% of our population is African American. And I promise you 59% of that 60% find the Confederate battle flag to be offensive. And the Christmas parade is supposed to be about peace, love, all of those things. Counsel, where we're headed, you've got some good points, and the Heritage Group has its points. What we're trying to get to is what is the involvement with the city, with the decision-making, regardless of the United Auto Workers case dealing about whether they're a separate or non-state actor or not. We need to look at what the city's control over this was and whether you might have some liability. I understand, Judge. So, I mean, these other issues tell us why we're here, but tell us the law here. The complaints came to the city, and the city could have just said, ain't operating, don't bother me. That's not the right approach. The right approach is to listen to the citizens. And so then the mayor talked with these sites to see if there's some resolution. And there is no resolution. And so then he made a request to the permit holder of the parade not to allow the Confederate battle flag. And I don't know why this case has always seemed simple to me, probably because I'm not a scholarly lawyer. I just work hard. But Grambling University has a homecoming parade every year. Southern University has a homecoming parade every year. You will never see the Ku Klux Klan in their parade, never. Now, I'm not saying because the law requires that. Maybe I'm wrong. If the courts ever say you've got to allow them, as a matter of freedom of speech, to be in your parade, I bet you there won't be a parade. Counsel, I have this recollection that in your brief you discussed whether the mayor was a policymaker or not and whether that was relevant to the liability of the city. Is that correct? Yes, sir. Do you want to address that? Whether or not it's relevant? No, whether or not what is the role of the mayor in the city and why isn't his, it seems to me, close to maybe not requiring, but we don't know what all may have happened behind the scenes, but basically informing the historic district that you really shouldn't let these people march, why isn't that a decision by the city for which the city has potentially municipal liability? I'm not sure I fully understand your question. I've said it poorly, no doubt, but why isn't the city decision, why isn't the mayor's direction encouraging, that may have been more than encouraging, don't let these people march with the flag, and we know they won't march without the flag, why isn't that a decision for which the city should be held responsible? Well, as pointed out in the trial judge's ruling, the mayor's not the final policymaker. He is not, and there's reference in counsel's brief to, in the Why do we wait until 90% of your oral argument to get to, isn't that the key here? Well, I was just asked that. Whether he's the policymaker or not, and if he's not, we're done. He's not. He's not. And ordinance number 35 says that this ordinance is passed pursuant to general law and the home rule charter of the city of Natchitoches, which is state law, which the court can take judicial cognizance of. He is not the final policymaker. Who is? The city council. Okay, and the city's also been sued. Yes, but they didn't write a letter to the city council. The city council didn't write any letter. They didn't vote on it. This was the mayor's letter based on his contact with the public. What about Ms. Bonet? The question of whether or not HDBA is in the public sector or private entity, there's absolutely no evidence in the record, none. None that they are anything other than a private entity. Mr. Nadler deposed everybody he could think of and not one person. Look, it would have been to the benefit of Lee Waskin, but throw the city under the bus. For him to say, when I got that letter from the mayor, I knew what I had to do. That is not what he said. In fact, what he said was, this is our party, we make the rules for this party, and if you don't like the rules that we make under our standards of excellence, et cetera, then go to another party. Not we, the HDBA has refused to allow groups that have been in the parade for years to march after they made a determination that their dancing was lewd. Now, and I asked the chairman of the parade, so how do you determine what is lewd? And I think he borrowed this from one of our former U.S. justices, and he said, I can't define lewd, but I know it when I see it. And so there have been other people that the city had no input in at all, none, as to whether or not these people who marched earlier in the parade were told they couldn't march again. Counsel, this is your first argument. It's our fifth. Why don't we, your time is up. Your time is up, but I have two questions for you, and you can have an extra two minutes also, Counsel, because I want to make sure we're fair here. Did, okay, these individuals, the mayor and the chief and Ms. Bonnet, they're all government employees. Did they play a direct role in enforcing the speech restrictions of the HDBA? Did they personally play a direct role? Speech. In a speech. Speech. Did they help enforce the speech restrictions of the private entity? That may not mean that they're liable as the city, but they've been sued also individually. No, they have not been sued in their individual capacities. Okay. Yes, but I'll still answer your question if it's relevant to you. Ms. Bonnet testified in her deposition. She didn't even know about the letter, so she went to the meeting of the Christmas Festival Committee, the HDBA Christmas Festival Committee. Mr. Wascomb came in, read the letter from the mayor, and said, unless there is substantial objection, I'm going to follow the mayor's request. That's the first time she had ever seen the letter or heard about the letter. Okay. And the chief? And the chief had nothing to do and no knowledge of the letter itself. So he didn't propagate or enforce the letter? He didn't enforce the letter? Well, there was nothing to enforce. No, ma'am. But now, had, you know, I asked in deposition one of the HDBA representatives, so why did you sue Chief Duck? And his answer was, because if we had marched in the parade, he might have arrested us. And I said, so you sued him because you might have done something that you didn't do, and he might have done something that he didn't do. And he says, yeah. Okay. And then the last thing is, did the city or any of the city employees play a role in drafting the standards of excellence or in reviewing the standards of excellence? What does the record show on that? No. Absolutely. No, but you didn't, in your capacity as the lawyer, I thought you reviewed this and approved it. I sat across the table at Rotary from Fred Terrassa. He told me, I have prepared this standard of excellence. Would you mind looking at it for me? I'd be glad to. I didn't build the city. A lot in your city capacity. I got it. Thank you very much. Thank you for your argument today. We have a rebuttal, and you may, you had two extra minutes, but you don't have to use them unless you need them, and let's move on. Yes, Your Honor. Thank you. Yes, quickly addressing what the HDBA has stated. There's been several omissions made. First of all, any application that was signed or unsigned or anything was not the reason behind that letter. The letters clearly stated there were requests that my client not march into parades with the flag. It has nothing to do with allegedly not signing the application. The letter shows that the mayor is the policymaker and can act without the city council having approved it and buying the city. Well, Your Honor, the thing with that was that was not, the first time I was brought up in a home rule charter was brought up by the judge himself. That was never introduced into evidence. It doesn't matter. You can take judicial notice. Okay. Your Honor, the reason why we say this is because he took the lead in organizing the meetings. He wrote the letter on city letterhead. There was no one from the city council that said, hey, look, mayor, you can't do it. So if that were, I mean, the city doesn't have to say you weren't authorized. The city has to say you were authorized, and where did they say that? Your Honor, they do not, but the mayor himself stated in deposition testimony that he took the lead. You didn't sue the mayor, did you? Yes, I did, Your Honor. Individually? No, no, Your Honor, in his official capacity. Any of these people individually did you sue? No, Your Honor, all in their official capacity. Okay. So that's the question. And that's why that's a problem. I mean, mayors do a lot of stuff on behalf of their cities in terms of, you know, when I'm walking through Love Field, the mayor is talking about what a great city Dallas is and welcome to the city, whatever. Nobody thinks that's anything other than the mayor's thoughts. The city council would have to vote if he was going to commit the city to anything. So the fact that the mayor uses his, you know, bully pulpit, if you will, is not unheard of. But the question of whether that binds the city is a legal question. And what shows that it binds the city? Your Honor, I'm stating that it's the same thing when a policeman violates the rights of a citizen. His illegal unconstitutional actions binds the agency that hires him. Well, actually, 1983 is not a vicarious liability statute. Well, Your Honor, if the policeman is following an unconstitutional policy and then acts under the collar of law. So I'm saying where is the city council policy that people can't participate in parades if they exhibit confederate values? Well, Your Honor, we're stating that the letter that the mayor wrote where he made the request. Yes, Your Honor, but I understand. Get back to it. But no, Your Honor, the Cooperative Endeavor Agreement, which was signed by the mayor and the HDBA. Did the city council ratify the Cooperative Endeavor Agreement? Yes, Your Honor, the city council did ratify it. And where does that say the mayor has the power to write a letter like that? It does not, Your Honor. It just basically states that what it does is differentiate the roles between what the city does and what the HDBA does. Did the city council authorize the payment for all the security and all of that? It's authorized in the city budget by the payment of Mr. Pat Jones. But to also answer your question about the HDBA, they also remit about, at that time, $25,000 to the city per Cooperative Endeavor Agreement. Like I said, it's for a public policy. We did not know that role.  And my client, when they throw up the prescription issue, it's my client. They had no idea because they actively stated that they were private. And then when we uncovered evidence otherwise, now my client is being penalized for that. And that's how we relate to that. Now, also, Your Honor, although the Cooperative Endeavor Agreement does not state anything about the mayor is authorized to write a letter stating who can and cannot participate, the mayor, the city itself, through the mayor, is the one that he is the one that select the employee that sat on the HDBA Parade Committee. That was Ms. Bonette. He's also the one, the police chief himself, in an email, stated to somebody, when he was referring to the city of Manny being upset about the SCV not marching in front of Confederate battle flags, he stated it was our decision, referring to himself and the mayor. And that's included in the brief. I wrote that verbatim. The other thing is, as far as Charles Drago, the security expert, we did oppose that. We said it violated the rules of Evidence 701 and 702. He wasn't an expert on security. Another thing that was omitted by the HDBA was the fact that there were many, that day of the parade itself, many people did carry Confederate flags. There was no evidence of any disruption or anything caused by this. And it was flags that were passed out to people that were parade viewers. That's always, they always never address that. If there was security concern, why was this done? There was no disruption that day. The security expert, the alleged security expert, we're opposing that designation, doesn't address that. Now, getting back to the Cooperative Endeavor Agreement, because it's allowed by the Constitution of Louisiana, in their Cooperative Endeavor Agreement, it states what role the mayor and the city itself has. And I'm alleging that one of the implied tasks is that the mayor carry out this Cooperative Endeavor Agreement with the HDBA. And that's what authorizes him to write that letter. So you're saying the Endeavor Agreement was ratified by the city council and gave the mayor certain powers. Yes, Your Honor. And that's like a penumbrum. We'll have to check that out to see. Yeah. The Cooperative Endeavor Agreement is actually in the record itself. Right. Yes, sir. And it falls like, I was in the U.S. Army, we call it an implied task. There's a penumbrum, a shadow that falls, and that's what I'm going to argue that in this case, because that's a very good question that Judge Hames brought up. The last thing I'm going to state is, in the end, my client really would like to be allowed to participate, to be invited to be allowed to participate in a parade carrying the historical flags that it's carried all the time. Thank you, counsel. Thank you. We have your argument. We appreciate all the arguments today. And this case is submitted, and we will stand in recess until tomorrow at 9 a.m. Thank you. All rise. Okay.